## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
## SECOND JUDICIAL DISTRICT

**EARL DELACK, ANDREA DELACK, AND**
**HANNAH DELACK, REBECCA DELACK, AND**
**OWEN DELACK, MINORS,**
**BY AND THROUGH THEIR NATURAL**
**GUARDIANS, EARL AND ANDREA DELACK**                    **PLAINTIFFS**

**VERSUS**                                       CAUSE NO. A2402-17-166

**HUNT SOUTHERN GROUP, LLC FKA**
**FOREST CITY SOUTHERN GROUP, LLC,**
**FOREST CITY RESIDENTIAL MANAGEMENT, LLC,**
**HUNT MH PROPERTY MANAGEMENT, LLC,**
**UNKNOWN JOHN AND JANE DOES A THROUGH M, AND**
**OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z**     **DEFENDANTS**

---

### SUMMONS

---

STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:   **Hunt Southern Group, LLC fka Forest City Southern Group, LLC**
      **c/o Registered Agent**
      **Capitol Corporate Services, Inc.**
      **248 E. Capitol Street, Suite 840**
      **Jackson, Mississippi 39201**
      **OR WHEREEVER THEY MAY BE FOUND**



### NOTICE TO DEFENDANT(S)

### THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand-deliver a copy of a written response to the Complaint to RUSHING & GUICE, P. L. L. C., the attorneys for the Plaintiff, whose address is Post Office Box 1925, Biloxi, Mississippi 39533-1925 and whose street address is 1000 Government Street, Suite E, 2nd Floor, Ocean Springs, Mississippi 39564. Your response must be mailed or delivered within thirty (30) days from the date of delivery of this summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.



EXHIBIT
A

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22nd day of December, 2017.

CONNIE LADNER, CIRCUIT CLERK
HARRISON COUNTY, MS

BY: _Christie Kenley_____ D.C.

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

EARL DELACK, ANDREA DELACK, AND
HANNAH DELACK, REBECCA DELACK, AND
OWEN DELACK, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, EARL AND ANDREA DELACK

**F I L E D**

DEC 2 2 2017

CONNIE LADNER
CIRCUIT CLERK
BY: _____ D.C.

**PLAINTIFFS**

**VERSUS**

CAUSE NO. A2402-17-166

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

## COMPLAINT

## JURY TRIAL REQUESTED

COME NOW Plaintiffs, Earl Delack, Andrea Delack, and Hannah Delack, Rebecca Delack, and Owen Delack, Minors, by and through their natural guardians, Earl and Andrea Delack (Plaintiffs), by and through their attorneys, Rushing & Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest City Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate Entities N through Z (Defendants), and for good cause of action, states unto the Court the following, to-wit:

### PARTIES

1.

Plaintiff, Earl Delack ("Earl"), is an adult citizen of Harrison County, Mississippi residing at 2558 Rue Palafox, Biloxi, Mississippi.

2.

Plaintiff, Andrea Delack ("Andrea"), is an adult citizen of Parker County, Texas residing at 152 Tall Meadow Street, Azle, Texas.

3.

Plaintiff, Hannah Delack ("Hannah"), is the minor child of Earl and Andrea, her natural guardians, born March 22, 2006, and is a resident of the State of Texas, residing at 152 Tall Meadow Street, Azle, Texas.

4.

Plaintiff, Rebecca Delack ("Rebecca"), is the minor child of Earl and Andrea, her natural guardians, born July 24, 2008, and is a resident of the State of Texas, residing at 152 Tall Meadow Street, Azle, Texas.

5.

Plaintiff, Owen Delack ("Owen"), is the minor child of Earl and Andrea, his natural guardians, born May 8, 2015, and is a resident of the State of Texas, residing at 152 Tall Meadow Street, Azle, Texas.

6.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840,

Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

7.

Defendant, Forest City Residential. Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

8.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

9.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

10.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

### 11.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Earl resides. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who at the time of the contract were residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 12.

Earl is a First Sergeant in the United States Marine Corp. In 2015 Earl and his family received orders reassigning him to Keesler Air Force Base in Biloxi, Mississippi. Like other military families moving to the area, the military housing assignment for the Plaintiffs was controlled by Defendant, Hunt Southern fka Forest City Southern.

### 13.

Plaintiffs entered into a Military Lease Agreement with Defendants in April of 2015 and were assigned military housing at 104 Orville Wright Drive in Biloxi, Mississippi in the County of Harrison (Subject Property). Plaintiffs moved into the Subject Property in April of 2015. The Subject Property is located in the Bayridge Neighborhood, an exclusive Officers and Senior enlisted Community. Bayridge is comprised of 330 homes and is located on Keesler Air Force

Base. At all times mentioned herein, Plaintiffs' home was owned, controlled or managed by one of Defendants.

13.

At the time Earl entered into the Military Lease Agreement, Bayridge was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Bayridge was acquired by Hunt Southern and operated or managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Bayridge and acted as the owners of Bayridge through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

14.

After moving into Bayridge, Plaintiffs reported several maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was later learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

15.

Plaintiffs' maintenance records show repeated requests for Defendants to address mold and leaking problems while they lived in Bayridge. The maintenance records show that the mold

was simply "cleaned with soap and water" instead of being removed. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided at Bayridge, Defendants never replaced the air conditioner filters, despite reporting on the maintenance report that it was done quarterly. Plaintiffs replaced the filters on their own.

16.

On one such occasion, or about November 5, 2015, Plaintiffs asked Defendants to address several mold patches and leaks in the Subject Property including on the master bedroom closet ceiling and the upstairs guest bathroom ceiling. Later that day, a maintenance person arrived to clean the suspected substance with Tilex (maintenance technicians were instructed not to call the substance mold). Later that month, on November 12, 2015, maintenance was again notified of mold in the upstairs hall closet and linen closet. Maintenance came out the next day, November 13, 2015, and cleaned the area with soap and water. The technician also checked the attic and stated that he felt water in the air conditioner ductwork. Rather than addressing the root of the mold, the maintenance technician again just cleaned the area with Tilex. This allowed for the toxic mold to continue flourishing beneath the surface.

17.

On another occasion, or about August 25, 2016, Plaintiffs again notified Defendants' maintenance department of mold and other issues and asked that a supervisor come out with the maintenance technician. Pamela Dawson accompanied the maintenance technician to the Plaintiffs' home. Again rather than addressing the root of the issues, Defendants used soap and

water to clean mold in the Plaintiffs' master bedroom closet, hallway closet, hallway linen closet, and in the hallway.

18.

On September 1, 2016 Plaintiffs called again to notify Defendants that black mold had again appeared in the same areas as before. Plaintiffs specifically asked that Terry Small, Defendants' Director of Maintenance, come and see the issues. He came that day and said he would send out contractors to tear out some sheet rock and rewrap the A/C ducts. He also adjusted the A/C wiring and the A/C vents downstairs. Plaintiffs also showed him the back door in the laundry room, and he said they would come replace it because it had water damage and it was rotting out.

19.

On September 6, 2016 Plaintiffs called Defendants to notify them that black mold had resurfaced in the same areas. Technicians arrived that day to clean the mold with soap and water. Two days later on September 8, 2016, Terry Small, two other employees of Defendants, and two contractors came to start the repairs on the upstairs. Before things started, Plaintiffs were told by Terry Small that the whole process would be very transparent and he would show them pictures of everything.

20.

After Terry Small identified the areas of concern he had Plaintiffs remove all their items from the closet. Plaintiffs called Small to remind him that they wanted to see all the pictures of the mold and were assured that they would. However, when asked their progress and the pictures, Terry Small showed them only one photo from the master closet location which happened to be the least affected area. When asked about the other locations Terry Small told

Plaintiffs that they were unable to get photos due to the drywall dropping straight into the bags. While Terry Small made a big deal of dropping the contaminated dry wall straight into the bag to be sealed immediately, he did not seem concerned with sealing off the contaminated area in the house. Terry Small failed to take pictures of the three other locations where significant mold had grown. Plaintiffs evacuated the house due to the possibility that the air was contaminated and stayed in a local hotel.

21.

The maintenance work that began on September 8, 2016 was not completed until September 10, 2016. Given their distrust of Hunt, Plaintiffs decided to inspect the attic of the house on or about September 20, 2016, about ten days after the work was completed. In addition to again seeing mold, they saw water on the air conditioner ducts and disconnected ventilation pipes. Plaintiffs immediately went to the housing office to speak to someone. After speaking with Mary Ranson (Director of Operations) and Brett Long (Chief over Capital Asset Management/Housing), Plaintiffs were able to get another date set for more repairs on October 10, 2016. Plaintiffs were also given a reservation at temporary housing in the neighborhood.

22.

In early October of 2016, Plaintiffs contacted various officials with Keesler Air Force to report the continuous toxic mold problem in the Subject Property. Despite these efforts nothing substantial was done to rectify the problems in the Subject Property. On or about October 3, 2016 Plaintiffs provided Defendants with their thirty-day notice to evacuate the Subject Property with a move out date of November 18, 2016.

23.

On October 12, 2016 Plaintiffs had Teddy Bear Restoration perform an air mold sampling in their home. The Certificate of Mold analysis showed several different spores growing in the house, the most concerning being Penicillium/Aspergillus which can cause serious health issues. See Certificate of Mold Analysis attached hereto as **Exhibit "A."**

24.

On October 28, 2016, Plaintiffs had additional testing performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Stachybotrys inside the Subject Property and none outside the Subject Property. These elevated levels of toxic black mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

25.

Also in October, Defendants' Senior Director of Operations, Stacia Schuster, offered Plaintiffs an agreement where Defendants would forego charging Plaintiffs' October and November rent and would reimburse Plaintiffs for their hotel expenses which had been incurred during the maintenance work. Defendants did not provide any offers for reimbursement for the moving expenses that Plaintiffs would incur as a result of the forced move. Plaintiffs did not sign the agreement and instead prepared to move out of the house, completing the final housing inspection on November 4, 2016. Because Defendants refused to honor their contractual obligation to cover the expense of Plaintiffs' relocation, Plaintiffs incurred great expense in moving themselves. They also suffered property loss due to mold contamination and have not been compensated for any of their losses.

26.

Plaintiffs have obtained information from other military housing families which has led them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including other Bayridge.

27.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

28.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

29.

In this case, Plaintiffs had two different certified mold investigators identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Stachybotrys, commonly referred to as "black mold" or "toxic mold,"

was identified as growing inside the house. Additionally, Aspergillus, known to be a powerful respiratory irritant, was found in the home during the spore trap test. Both spores are particularly dangerous, as both are well known to grow in excessive numbers in damp indoor spaces and both release mycotoxins and VOCs, and have toxic impacts of their own. The Stachybotrys spore levels found inside the home by tape and air samples were considered "elevated" considering that this spore was not detected in the outside control levels. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs were forced to live in.

30.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

**COUNT I**

**NEGLIGENCE**

31.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 30.

32.

Defendants, as owners and/or managers of Bayridge:

A. Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B. Negligently failed to pay for relocation expenses and caused Plaintiffs to pay for the moving expenses;

C. Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D. Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E. Negligently managed and maintained Bayridge;

F. Negligently supervised their employees, agents and/or representatives;

G. Negligently trained and supervised their employees, agents and/or representatives;

H. Negligently inspected Bayridge for dangerous and harmful conditions;

I. Negligently remediated the toxic mold contained in the Subject Property;

J. Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K. Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L. Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.    Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

33.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

34.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 33.

35.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

36.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

37.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 36.

38.

Defendants breached the Military Lease Agreement entered into with Plaintiffs in April of 2015. The contract was breached for the following reasons:

A.   Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.   Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.   The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.   Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.   Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.     Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.     Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation." Plaintiffs shouldered the entire cost of the relocation.

39.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

40.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 39.

41.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 42.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 41.

### 43.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

### 44.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 43.

### 45.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.     Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.     Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.     Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.     Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.     Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

46.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 45.

47.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous

conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

### 48.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 47.

### 49.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

### 50.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 49.

### 51.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which was repeated until Plaintiffs moved out of the Subject Property.

## DISABILITY OF INFANCY

### 52.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 51.

53.

Hannah, Rebecca and Owen are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

**DAMAGES**

54.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 53.

55.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Earl Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Andrea Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Hannah Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for:

D. Plaintiff, Rebecca Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for; and

E. Plaintiff, Owen Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

### 56.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 55.

### 57.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and

Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

58.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 57.

59.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.


## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**EARL DELACK, ANDREA DELACK, AND
HANNAH DELACK, REBECCA DELACK,
AND OWEN DELACK, MINORS, BY AND
THROUGH THEIR NATURAL GUARDIANS,
EARL AND ANDREA DELACK, PLAINTIFFS**

BY:

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

*Earl. Delack @ U.S. a8 mail*

TEDDY BEAR RESTORATION

9230 OLD LORRAINE RD

GULFPORT,  MS  39503

# Certificate of Mold Analysis

| | |
|---|---|
| Prepared for: | TEDDY BEAR RESTORATION |
| Phone Number: | (228) 896-8446 |
| Fax Number: | (228) 896-3490 |
| Project Name: | EARL DELACK |
| Test Location: | 104 ORVILLE WRIGHT DR |
| | BILOXI, MS  39531 |
| Chain of Custody #: | 988338 |
| Received Date: | October 14, 2016 |
| Report Date: | October 17, 2016 |

_____
Erika Piechowski, Technical Manager

_____
Carlos Ochoa, Quality Control Manager

Currently there are no Federal regulations for evaluating potential health effects of fungal contamination and remediation. This information is subject to change as more information regarding fungal contaminants becomes available. For more information visit http://www.epa.gov/mold or www.nyc.gov/html/doh/html/epi/mold.shtml. This document was designed to follow currently known industry guidelines for the interpretation of microbial sampling, analysis, and remediation. Since interpretation of mold analysis reports is a scientific work in progress, it may as such be changed at any time without notice. The client is solely responsible for the use or interpretation. PRO-LAB/SSPTM Inc. makes no express or implied warranties as to health of a property from only the samples sent to their laboratory for analysis. The Client is hereby notified that due to the subjective nature of fungal analysis and the mold growth process, laboratory samples can and do change over time relative to the originally sampled material. PRO-LAB/SSPTM Inc. reserves the right to properly dispose of all samples after the testing of such samples are sufficiently completed or after a 7 day period, whichever is greater.



AIHA LAP, LLC
ACCREDITED LABORATORY
ENVIRONMENTAL MICROBIOLOGY
ISO/IEC 17025:2005
WWW.AIHAACCREDITEDLABS.ORG
LAB # 163230

**For more information please contact PRO-LAB at (954) 384-4446 or email info@prolabinc.com**



EXHIBIT

A



**PRO-LAB®**

1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

**Prepared for :** TEDDY BEAR RESTORATION

**Test Address :** EARL DELACK
104 ORVILLE WRIGHT DR
BILOXI, MS  39531

| ANALYSIS METHOD | Spore trap analysis | | | Spore trap analysis | | | INTENTIONALLY BLANK | | | INTENTIONALLY BLANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION | INSIDE HOUSE | | | OUTSIDE HOUSE | | | | | | | | |
| COC / LINE # | 988338-1 | | | 988338-2 | | | | | | | | |
| SAMPLE TYPE & VOLUME | Z5 - 25L | | | Z5 - 25L | | | | | | | | |
| SERIAL NUMBER | Q399126 | | | Q399182 | | | | | | | | |
| COLLECTION DATE | Oct 12, 2016 | | | Oct 12, 2016 | | | | | | | | |
| ANALYSIS DATE | Oct 17, 2016 | | | Oct 17, 2016 | | | | | | | | |
| CONCLUSION | NOT ELEVATED | | | CONTROL | | | | | | | | |
| IDENTIFICATION | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total |
| Cladosporium | 5 | 200 | 24 | 45 | 1,800 | 51 | | | | | | |
| Other Ascospores | 4 | 160 | 19 | 10 | 400 | 11 | | | | | | |
| Other Basidiospores | 7 | 280 | 33 | 31 | 1,200 | 34 | | | | | | |
| Penicillium/Aspergillus | 4 | 160 | 19 | | | | | | | | | |
| Pithomyces | 1 | 40 | 5 | | | | | | | | | |
| Unidentified Spores | | | | 3 | 120 | 3 | | | | | | |
| TOTAL SPORES | 21 | 840 | 100 | 89 | 3,520 | 100 | | | | | | |
| MINIMUM DETECTION LIMIT* | 1 | 40 | | 1 | 40 | | | | | | | |
| BACKGROUND DEBRIS | too heavy for accurate count. | | | Light | | | | | | | | |
| Cellulose Fiber | 87 | 3,500 | | | | | | | | | | |
| Pollen | | | | 3 | 120 | | | | | | | |
| OBSERVATIONS & COMMENTS | Counts are estimated. Actual numbers of spores probably much higher. | | | | | | | | | | | |

Background debris qualitatively estimates the amount of particles that are not pollen or spores and directly affects the accuracy of the spore counts.  The categories of Light, Moderate, Heavy and Too Heavy for Accurate Count, are used to indicate the amount of deposited debris.  Increasing amounts of debris will obscure small spores and can prevent spores from impacting onto the slide.  The actual number of spores present in the sample is likely higher than reported if the debris estimate is 'Heavy' or 'Too Heavy for Accurate Count'.  All calculations are rounded to two significant figures and therefore, the total percentage of spore numbers may not equal 100%.
* Minimum Detection Limit. Based on the volume of air sampled, this is the lowest number of spores that can be detected and is an estimate of the lowest concentration of spores that can be read  in the sample.
NA = Not Applicable.

Spores that were observed from the samples submitted are listed on this report.  If a spore is not listed on this report it was not observed in the samples submitted.

Interpretation Guidelines: A determination is added to the report to help users interpret the mold analysis results. A mold report is only one aspect of an indoor air quality investigation. The most important aspect of mold growth in a living space is the availability of water. Without a source of water, mold generally will not become a problem in buildings. These determinations are in no way meant to imply any health outcomes or financial decisions based solely on this report. For questions relating to medical conditions you should consult an occupational or environmental health physician or professional.
CONTROL is a baseline sample showing what the spore count and diversity is at the time of sampling. The control sample(s) is usually collected outside of the structure being tested and used to determine if this sample(s) is similar in diversity and abundance to the inside sample(s).
ELEVATED means that the amount and/or diversity of spores, as compared to the control sample(s) and other samples in our database, are higher than expected. This can indicate that fungi have grown because of a water leak or water intrusion. Fungi that are considered to be indicators of water damage include, but are not limited to: Chaetomium, Fusarium, Memnoniella, Stachybotrys, Scopulariopsis, Ulocladium.
NOT ELEVATED means that the amount and/or the diversity of spores, as compared to the control sample and other samples in our database, are lower than expected and may indicate no problematic fungal growth.
UNUSUAL means that the presence of current or former growth was observed in the analyzed sample. An abundance of spores are present, and/or growth structures including hyphae and/or fruiting bodies are present and associated with one or more of the types of mold/fungi identified in the analyzed sample.
NORMAL means that no presence of current or former growth was observed in the analyzed sample. If spores are recorded they are normally what is in the air and have settled on the surface(s) tested.

**PRO-LAB**

1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

**Chain of Custody #**  988338



Inside House

Outside House

**Spores per cubic meter**

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

| Habitat | Indoor Habitat | Possible Allergic Potential<br>Not an opinion or interpretation | Comments |
|---|---|---|---|
| ommon spore type the air worldwide. ead and dying plant oil. | Commonly found on wood and wallboard. Commonly grows on window sills, textiles and foods. | Type I (hay fever and asthma), Type III (hypersensitivity pneumonitis) allergies. | A very common and important allergen source both outdoors and indoors. |
| verywhere. a large part of the tside. Can reach umbers in the air ing the spring and an increase in ring and after | Very few of this group grow inside. The notable exception is Chaetomium, Ascotricha and Peziza. | Little known for most of this group of fungi. Dependent on the type (see Chaetomium and Ascotricha). | |
| found everywhere, n the late summer ese spores are from s. | Mushrooms are not normally found growing indoors, but can grow on wet lumber, especially in crawlspaces. Sometimes mushrooms can be seen growing in flower pots indoors. | Some allergenicity reported. Type I (hay fever, asthma) and Type III (hypersensitivity pneumonitis). | Among the group of Mushrooms (Basidiomycetes) are dry rot fungi Serpula and Poria that are particularly destructive to buildings. |
| verywhere. Normally e air in small amounts air. Grows on nearly | Wetted wallboard, wood, food, leather, etc. Able to grow on many substrates indoors. | Type I (hay fever and asthma) allergies and Type III (hypersensitivity pneumonitis) allergies. | This is a combination group of Penicillium and Aspergillus and is used when only the spores are seen. The spores are so similar that they cannot be reliably separated into their respective genera. |
| seen everywhere, ad leaves, soil and | Not normally found growing indoors, sometimes on wallboard. | None known. | |
| verywhere. Grow on ant litter and other ed material. | Wetted cellulosic material. | None known. | This group of spores is reserved for spores whose identity is unknown. These kinds of spores have usually never been seen before in spore traps by our laboratory and/or are of such morphology that they cannot be identified with any degree of certainty to a particular genus. |



1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

Prepared for : TEDDY BEAR RESTORATION

Test Address : EARL DELACK

104 ORVILLE WRIGHT DR

BILOXI, MS  39531

## Indoor Air Quality Testing

### Introduction

The fungi are a large group of organisms that include mold. In nature, the fungi and mold help breakdown and recycle nutrients in the environment. Mold are the most common type of fungi that grow indoors. Mold are microscopic organisms that live on plants, in the soil, and on animals. In fact almost anywhere food and moisture are available. Mold is everywhere present in the outdoor and normal indoor environments. It is in the air and on surfaces as settled dust. Exposure to mold is inevitable in everyday life. Thus, exposure to mold is considered part of a normal activity for most people. Only environments for which extraordinary preparations have been taken don't have mold present in the air or on surfaces.

### Understanding Mold

Under the right conditions (moisture, a food source, and time) mold will grow, multiply and produce spores. Mold grows throughout nature as well as the built environment. Mold reproduces by microscopic cells called "spores" that can be spread easily through the air. Mold spores are always present in the indoor and outdoor air. There are mold that can grow on any organic substrate including wood, paper, carpet, food, ceiling tiles, dried fish, carpet, or any surface where dust has accumulated. When excessive moisture or water accumulates indoors, mold growth will often occur, particularly if the moisture problem remains undiscovered or un-addressed. There is no practical way to eliminate all mold spores in the indoor environment. The way to control indoor mold growth is to control the amount of moisture available to the mold.

Mold growth can become a problem in your home or office where there is sufficient moisture and the right foodstuff is available. The key to preventing mold growth is to prevent all moisture problems. Of course, hidden mold can grow when there is water available behind walls, sinks, floors, etc. Indications of hidden moisture problems are discoloration of ceiling or walls, warped floors or condensation on the windows or walls.

### Controlling Moisture

The most critical step in solving a mold problem is to accurately identify and fix the source(s) of moisture that allowed the growth to occur. In order to prevent mold from growing, it is important that water damaged areas be dried within a 24-48 hour period. If a small amount of mold is present in the home, the mold can be cleaned up with a mild detergent and the excess water or moisture removed. It is not necessary to try and kill the mold or its spores. You can carefully remove the moldy materials if necessary.  There are many common sources of excess moisture that can contribute to indoor mold growth. Some of the primary means of moisture entry into homes and buildings are water leakage (such as roof or plumbing leaks), vapor migration, capillary movement, air infiltration, humidifier use, and inadequate venting of kitchen and bath humidity. The key to controlling moisture is to generally reduce indoor humidity within 35% - 60% (depending what climate you live in) and fix all leaks whatever their cause.

### Mold Growth Sources

If the source of moisture is not easily detected or you have a hidden water leak, mold testing can be helpful. Often a roof leak or a plumbing leak can be identified as the source. The difficulty arises when there is an odor present or when an occupant shows signs of mold exposure but no visible mold can be seen. Excess water intrusion can also lead to dry rot of lumber and cause a serious structural defect in buildings.

### Health Related Risks

Based on the Institute of Medicine and the National Academy of Sciences, dampness and mold in homes is associated with increases in several adverse health effects including cough, upper respiratory symptoms, wheeze, and exacerbation of asthma. Mold and fungi contain many known allergens and toxins that can adversely affect your health. Scientific evidence suggests that the disease of asthma may be more prevalent in damp affected buildings. Dampness and mold in homes, office buildings and schools represent a public health problem. The Institute of Medicine concluded, "When microbial contamination is found, it should be eliminated by means that not only limit the possibility of recurrence but also limit exposure of occupants and persons conducting the remediation".



1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

## Mold Sampling Methods

The goal of sampling is to learn about the levels of mold growth and amplification in buildings. There are no EPA or OSHA standards for levels of fungi and mold in indoor environments. There are also no standard collection methods. However, several generally accepted collection methods are available to inspectors to study mold (and bacteria) in indoor environments. Comparison with reference samples can be a useful approach. Reference samples are usually taken outdoors and sometimes samples can be taken from "non-complaint" areas. In general, indoor fungal concentrations should be similar to or lower than outdoor levels. High levels of mold only found inside buildings often suggest indoor amplification of the fungi. Furthermore, the detection of water-indicating fungi, even at low levels, may require further evaluation. There are several types of testing methods that can detect the presence of mold. They can be used to find mold spores that are suspended in air, in settled dust, or mold growing on surfaces of building materials and furnishings. There are different methods that can identify types of live mold and dead mold in a sampled environment. Mold spores can be allergenic and toxic even when dead.

All sampled material obtained in the laboratory is analyzed using modern microscopic methods, standard and innovative mycological techniques, analyzed at 630 – 1,000 times magnification.

Testing for mold with an accredited laboratory is the best way to determine if you have mold and what type of mold it is.

## Surface Sampling Methods

Surface sampling can be useful for differentiating between mold growth and stains of various kinds. This type of sampling is used to identify the type of mold growth that may be present and help investigate water intrusion. Surface sampling can help the interpretation of building inspections when used correctly. The following are the different types of surface samples that are commonly used to perform a direct examination of a specific location. Spore counts per area are not normally useful.

### Tape (or tape-lift)
These samples are collected using clear adhesive tape or adhesive slide for microscopic examination of suspect stains, settled dust and spores. Tape lifts are an excellent, non-destructive method of sampling. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.

### Bulk
This is a destructive test of materials (e.g., settled dust, sections of wallboard, pieces of duct lining, carpet segments, return-air filters, etc.) to determine if they contain or show mold growth. Bulk sampling collects a portion of material small enough to be transported conveniently and handled easily in the laboratory while still representing the material being sampled. A representative sample is taken from the bulk sample and can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.

### Swab
A sterile cotton or synthetic fiber-tipped swab is used to test an area of suspected mold growth. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if there is current of former mold growth or if only normally settled spores were sampled. Identified spores are generally reported as "present/absent".

### Carpet (filter-type) Cassette
A carpet cassette is used with a portable air pump (flow rate usually doesn't matter) to collect mold, pollen and other particulates. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. This method is usually used to determine a presence or absence of water-indicating mold in a carpet. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.



1675 North Commerce Parkway, Weston, FL  33326   (954) 384-4446

# Air Sampling Methods

Air samples are possibly the most common type of environmental sample that investigators collect to study bioaerosols (mold, pollen, particulates). The physics of removing particles from the air and the general principles of good sample collection apply to all airborne materials, whether biological or other origin. Therefore, many of the basic principles investigators use to identify and quantify other airborne particulate matter can be adapted to bioaerosol sampling. Common to all aerosol samplers is consideration of collection efficiency. The following are the two most common forms of air sampling methods.

**"Non-Viable Methods"**  *(The Laboratory results are reported in "spores per cubic meter (sp/m3)*

**Z5 Cassette**

The $Z^5$ spore trap is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to rapidly collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small slit at the top of the cassette and spores are trapped on a sticky surface on a small glass slide inside the cassette. They are efficient at collecting spores as small as 1µm.

**Micro5 Cassette**

The Micro5 Microcell spore trap cassette is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small circular hole at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. They are efficient at collecting spores as small as 0.8µm.

**Air-O-Cell Cassette**

The Air-O-Cell spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 2.6µm.

**Allergenco-D Cassette**

The Allergenco-D spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 1.7µm.

**"Viable Methods"**  *(The Laboratory results are reported in "colony forming units per cubic meter (CFU/m3)*

**Agar Impaction Plates**

The agar impaction plates are used with a portable air pump (28.3 liters/minute for 1 to 3 minutes) to collect airborne mold. This is called "viable sampling" because it only grows what is alive at the time of testing. Air is drawn through a 200-400 holes at the top of the impactor and spores are trapped in the agar media. The agar plate should be shipped to the laboratory immediately or kept cool until it can be shipped. These cassettes are 90% efficient at collecting spores as small as 0.7µm. The laboratory results are reported in "colony forming units per cubic meter (CFU/m$^3$)".

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

EARL DELACK, ANDREA DELACK, AND
HANNAH DELACK, REBECCA DELACK, AND
OWEN DELACK, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, EARL AND ANDREA DELACK                          **PLAINTIFFS**

**VERSUS**                                      CAUSE NO. A2402-2017-166

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

## SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:   Hunt MH Property Management, LLC
      c/o Registered Agent
      Capitol Corporate Services, Inc.
      248 E. Capitol Street, Suite 840
      Jackson, Mississippi 39201
      OR WHEREEVER THEY MAY BE FOUND

## NOTICE TO DEFENDANT(S)

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT
AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to
**Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box
1925**, Biloxi, Mississippi 39533-1925 and whose street address is **1000 Government Street,
Suite E, 2nd Floor, Ocean Springs, Mississippi 39564**.  Your response must be mailed or
delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a
Judgment by default will be entered against you for the money or other things demanded in the
Complaint.

You must also file the original of your response with the Clerk of this Court within a
reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22nd day of December, 2017.

CONNIE LADNER, CIRCUIT CLERK
HARRISON COUNTY, MS

 (SEAL)

BY: _Christi Kessler_ D.C.

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT



EARL DELACK, ANDREA DELACK, AND
HANNAH DELACK, REBECCA DELACK, AND
OWEN DELACK, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, EARL AND ANDREA DELACK                    **PLAINTIFFS**

**VERSUS**                                    CAUSE NO. A2402-17-466

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z          **DEFENDANTS**

## COMPLAINT

## JURY TRIAL REQUESTED

COME NOW Plaintiffs, Earl Delack, Andrea Delack, and Hannah Delack, Rebecca

Delack, and Owen Delack, Minors, by and through their natural guardians, Earl and Andrea

Delack (Plaintiffs), by and through their attorneys, Rushing & Guice, P.L.L.C., and file this their

Complaint against Hunt Southern Group, LLC fka Forest City Southern Group, LLC, Forest City

Residential Management, LLC, Hunt MH Property Management, LLC, Unknown John and Jane

Does A through M, and Other Unknown Corporate Entities N through Z (Defendants), and for

good cause of action, states unto the Court the following, to-wit:

## PARTIES

1.

Plaintiff, Earl Delack ("Earl"), is an adult citizen of Harrison County, Mississippi

residing at 2558 Rue Palafox, Biloxi, Mississippi.

2.

Plaintiff, Andrea Delack ("Andrea"), is an adult citizen of Parker County, Texas residing at 152 Tall Meadow Street, Azle, Texas.

3.

Plaintiff, Hannah Delack ("Hannah"), is the minor child of Earl and Andrea, her natural guardians, born March 22, 2006, and is a resident of the State of Texas, residing at 152 Tall Meadow Street, Azle, Texas.

4.

Plaintiff, Rebecca Delack ("Rebecca"), is the minor child of Earl and Andrea, her natural guardians, born July 24, 2008, and is a resident of the State of Texas, residing at 152 Tall Meadow Street, Azle, Texas.

5.

Plaintiff, Owen Delack ("Owen"), is the minor child of Earl and Andrea, his natural guardians, born May 8, 2015, and is a resident of the State of Texas, residing at 152 Tall Meadow Street, Azle, Texas.

6.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840,

Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

7.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

8.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

9.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

10.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

11.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Earl resides. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who at the time of the contract were residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

12.

Earl is a First Sergeant in the United States Marine Corp. In 2015 Earl and his family received orders reassigning him to Keesler Air Force Base in Biloxi, Mississippi. Like other military families moving to the area, the military housing assignment for the Plaintiffs was controlled by Defendant, Hunt Southern fka Forest City Southern.

13.

Plaintiffs entered into a Military Lease Agreement with Defendants in April of 2015 and were assigned military housing at 104 Orville Wright Drive in Biloxi, Mississippi in the County of Harrison (Subject Property). Plaintiffs moved into the Subject Property in April of 2015. The Subject Property is located in the Bayridge Neighborhood, an exclusive Officers and Senior enlisted Community. Bayridge is comprised of 330 homes and is located on Keesler Air Force

Base. At all times mentioned herein, Plaintiffs' home was owned, controlled or managed by one of Defendants.

13.

At the time Earl entered into the Military Lease Agreement, Bayridge was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, Bayridge was acquired by Hunt Southern and operated or managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over Bayridge and acted as the owners of Bayridge through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

14.

After moving into Bayridge, Plaintiffs reported several maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was later learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

15.

Plaintiffs' maintenance records show repeated requests for Defendants to address mold and leaking problems while they lived in Bayridge. The maintenance records show that the mold

was simply "cleaned with soap and water" instead of being removed. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided at Bayridge, Defendants never replaced the air conditioner filters, despite reporting on the maintenance report that it was done quarterly. Plaintiffs replaced the filters on their own.

16.

On one such occasion, or about November 5, 2015, Plaintiffs asked Defendants to address several mold patches and leaks in the Subject Property including on the master bedroom closet ceiling and the upstairs guest bathroom ceiling. Later that day, a maintenance person arrived to clean the suspected substance with Tilex (maintenance technicians were instructed not to call the substance mold). Later that month, on November 12, 2015, maintenance was again notified of mold in the upstairs hall closet and linen closet. Maintenance came out the next day, November 13, 2015, and cleaned the area with soap and water. The technician also checked the attic and stated that he felt water in the air conditioner ductwork. Rather than addressing the root of the mold, the maintenance technician again just cleaned the area with Tilex. This allowed for the toxic mold to continue flourishing beneath the surface.

17.

On another occasion, or about August 25, 2016, Plaintiffs again notified Defendants' maintenance department of mold and other issues and asked that a supervisor come out with the maintenance technician. Pamela Dawson accompanied the maintenance technician to the Plaintiffs' home. Again rather than addressing the root of the issues, Defendants used soap and

water to clean mold in the Plaintiffs' master bedroom closet, hallway closet, hallway linen closet, and in the hallway.

18.

On September 1, 2016 Plaintiffs called again to notify Defendants that black mold had again appeared in the same areas as before. Plaintiffs specifically asked that Terry Small, Defendants' Director of Maintenance, come and see the issues. He came that day and said he would send out contractors to tear out some sheet rock and rewrap the A/C ducts. He also adjusted the A/C wiring and the A/C vents downstairs. Plaintiffs also showed him the back door in the laundry room, and he said they would come replace it because it had water damage and it was rotting out.

19.

On September 6, 2016 Plaintiffs called Defendants to notify them that black mold had resurfaced in the same areas. Technicians arrived that day to clean the mold with soap and water. Two days later on September 8, 2016, Terry Small, two other employees of Defendants, and two contractors came to start the repairs on the upstairs. Before things started, Plaintiffs were told by Terry Small that the whole process would be very transparent and he would show them pictures of everything.

20.

After Terry Small identified the areas of concern he had Plaintiffs remove all their items from the closet. Plaintiffs called Small to remind him that they wanted to see all the pictures of the mold and were assured that they would. However, when asked their progress and the pictures, Terry Small showed them only one photo from the master closet location which happened to be the least affected area. When asked about the other locations Terry Small told

Plaintiffs that they were unable to get photos due to the drywall dropping straight into the bags. While Terry Small made a big deal of dropping the contaminated dry wall straight into the bag to be sealed immediately, he did not seem concerned with sealing off the contaminated area in the house. Terry Small failed to take pictures of the three other locations where significant mold had grown. Plaintiffs evacuated the house due to the possibility that the air was contaminated and stayed in a local hotel.

21.

The maintenance work that began on September 8, 2016 was not completed until September 10, 2016. Given their distrust of Hunt, Plaintiffs decided to inspect the attic of the house on or about September 20, 2016, about ten days after the work was completed. In addition to again seeing mold, they saw water on the air conditioner ducts and disconnected ventilation pipes. Plaintiffs immediately went to the housing office to speak to someone. After speaking with Mary Ranson (Director of Operations) and Brett Long (Chief over Capital Asset Management/Housing), Plaintiffs were able to get another date set for more repairs on October 10, 2016. Plaintiffs were also given a reservation at temporary housing in the neighborhood.

22.

In early October of 2016, Plaintiffs contacted various officials with Keesler Air Force to report the continuous toxic mold problem in the Subject Property. Despite these efforts nothing substantial was done to rectify the problems in the Subject Property. On or about October 3, 2016 Plaintiffs provided Defendants with their thirty-day notice to evacuate the Subject Property with a move out date of November 18, 2016.

23.

On October 12, 2016 Plaintiffs had Teddy Bear Restoration perform an air mold sampling in their home. The Certificate of Mold analysis showed several different spores growing in the house, the most concerning being Penicillium/Aspergillus which can cause serious health issues. See Certificate of Mold Analysis attached hereto as **Exhibit "A."**

24.

On October 28, 2016, Plaintiffs had additional testing performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Stachybotrys inside the Subject Property and none outside the Subject Property. These elevated levels of toxic black mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

25.

Also in October, Defendants' Senior Director of Operations, Stacia Schuster, offered Plaintiffs an agreement where Defendants would forego charging Plaintiffs' October and November rent and would reimburse Plaintiffs for their hotel expenses which had been incurred during the maintenance work. Defendants did not provide any offers for reimbursement for the moving expenses that Plaintiffs would incur as a result of the forced move. Plaintiffs did not sign the agreement and instead prepared to move out of the house, completing the final housing inspection on November 4, 2016. Because Defendants refused to honor their contractual obligation to cover the expense of Plaintiffs' relocation, Plaintiffs incurred great expense in moving themselves. They also suffered property loss due to mold contamination and have not been compensated for any of their losses.

26.

Plaintiffs have obtained information from other military housing families which has led them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including other Bayridge.

27.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage.

28.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

29.

In this case, Plaintiffs had two different certified mold investigators identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Stachybotrys, commonly referred to as "black mold" or "toxic mold,"

was identified as growing inside the house. Additionally, Aspergillus, known to be a powerful respiratory irritant, was found in the home during the spore trap test. Both spores are particularly dangerous, as both are well known to grow in excessive numbers in damp indoor spaces and both release mycotoxins and VOCs, and have toxic impacts of their own. The Stachybotrys spore levels found inside the home by tape and air samples were considered "elevated" considering that this spore was not detected in the outside control levels. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs were forced to live in.

30.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

31.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 30.

32.

Defendants, as owners and/or managers of Bayridge:

A.    Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.    Negligently failed to pay for relocation expenses and caused Plaintiffs to pay for the moving expenses;

C.    Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.    Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.    Negligently managed and maintained Bayridge;

F.    Negligently supervised their employees, agents and/or representatives;

G.    Negligently trained and supervised their employees, agents and/or representatives;

H.    Negligently inspected Bayridge for dangerous and harmful conditions;

I.    Negligently remediated the toxic mold contained in the Subject Property;

J.    Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.    Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.    Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.    Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

33.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset,  losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

34.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 33.

35.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

36.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

37.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 36.

38.

Defendants breached the Military Lease Agreement entered into with Plaintiffs in April of 2015. The contract was breached for the following reasons:

A.   Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.   Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.   The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.   Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.   Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.     Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.     Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation." Plaintiffs shouldered the entire cost of the relocation.

39.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

40.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 39.

41.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 42.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 41.

### 43.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

### 44.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 43.

### 45.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.     Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.     Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.     Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.     Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.     Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

46.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 45.

47.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous

conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

48.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 47.

49.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

50.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 49.

51.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which was repeated until Plaintiffs moved out of the Subject Property.

## DISABILITY OF INFANCY

52.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 51.

53.

Hannah, Rebecca and Owen are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

**DAMAGES**

54.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 53.

55.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Earl Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Andrea Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Hannah Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for:

D. Plaintiff, Rebecca Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for; and

E. Plaintiff, Owen Delack, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

### 56.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 55.

### 57.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and

Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

58.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 57.

59.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**EARL DELACK, ANDREA DELACK, AND
HANNAH DELACK, REBECCA DELACK,
AND OWEN DELACK, MINORS, BY AND
THROUGH THEIR NATURAL GUARDIANS,
EARL AND ANDREA DELACK, PLAINTIFFS**

BY:

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

*Earl.Delack@U.S.af.mil*

TEDDY BEAR RESTORATION

9230 OLD LORRAINE RD

GULFPORT, MS 39503

# Certificate of Mold Analysis

| | |
|---|---|
| Prepared for: | TEDDY BEAR RESTORATION |
| Phone Number: | (228) 896-8446 |
| Fax Number: | (228) 896-3490 |
| Project Name: | EARL DELACK |
| Test Location: | 104 ORVILLE WRIGHT DR |
| | BILOXI, MS 39531 |
| Chain of Custody #: | 988338 |
| Received Date: | October 14, 2016 |
| Report Date: | October 17, 2016 |

Erika Piechowski, Technical Manager

Carlos Ochoa, Quality Control Manager

Currently there are no Federal regulations for evaluating potential health effects of fungal contamination and remediation. This information is subject to change as more information regarding fungal contaminants becomes available. For more information visit http://www.epa.gov/mold or www.nyc.gov/html/doh/html/epi/moldrs.shtml. This document was designed to follow currently known industry guidelines for the interpretation of microbial sampling, analysis, and remediation. Since interpretation of mold analysis reports is a scientific work in progress, it may as such be changed at any time without notice. The client is solely responsible for the use or interpretation. PRO-LAB/SSPTM Inc. makes no express or implied warranties as to health of a property from only the samples sent to their laboratory for analysis. The Client is hereby notified that due to the subjective nature of fungal analysis and the mold growth process, laboratory samples can and do change over time relative to the originally sampled material. PRO-LAB/SSPTM Inc. reserves the right to properly dispose of all samples after the testing of such samples are sufficiently completed or after a 7 day period, whichever is greater.



AIHA LAP, LLC

ACCREDITED LABORATORY
ENVIRONMENTAL MICROBIOLOGY
ISO/IEC 17025:2005

WWW.AIHAACCREDITEDLABS.ORG

LAB # 163230

**For more information please contact PRO-LAB at (954) 384-4446 or email info@prolabinc.com**



EXHIBIT

A

Page 1 of 9



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

Prepared for : TEDDY BEAR RESTORATION

Test Address : EARL DELACK
104 ORVILLE WRIGHT DR
BILOXI, MS 39531

| ANALYSIS METHOD | Spore trap analysis | | | Spore trap analysis | | | INTENTIONALLY BLANK | | | INTENTIONALLY BLANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCATION | INSIDE HOUSE | | | OUTSIDE HOUSE | | | | | | | | |
| COC / LINE # | 988338-1 | | | 988338-2 | | | | | | | | |
| SAMPLE TYPE & VOLUME | Z5 - 25L | | | Z5 - 25L | | | | | | | | |
| SERIAL NUMBER | Q399126 | | | Q399182 | | | | | | | | |
| COLLECTION DATE | Oct 12, 2016 | | | Oct 12, 2016 | | | | | | | | |
| ANALYSIS DATE | Oct 17, 2016 | | | Oct 17, 2016 | | | | | | | | |
| CONCLUSION | NOT ELEVATED | | | CONTROL | | | | | | | | |
| IDENTIFICATION | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total | Raw Count | Spores per m³ | Percent of Total |
| Cladosporium | 5 | 200 | 24 | 45 | 1,800 | 51 | | | | | | |
| Other Ascospores | 4 | 160 | 19 | 10 | 400 | 11 | | | | | | |
| Other Basidiospores | 7 | 260 | 33 | 31 | 1,200 | 34 | | | | | | |
| Penicillium/Aspergillus | 4 | 160 | 19 | | | | | | | | | |
| Pithomyces | 1 | 40 | 5 | | | | | | | | | |
| Unidentified Spores | | | | 3 | 120 | 3 | | | | | | |
| TOTAL SPORES | 21 | 840 | 100 | 89 | 3,520 | 100 | | | | | | |
| MINIMUM DETECTION LIMIT | 1 | 40 | | 1 | 40 | | | | | | | |
| BACKGROUND DEBRIS | too heavy for accurate count | | | Light | | | | | | | | |
| Cellulose Fiber | 87 | 3,500 | | | | | | | | | | |
| Pollen | | | | 3 | 120 | | | | | | | |
| OBSERVATIONS & COMMENTS | Counts are estimated. Actual numbers of spores probably much higher. | | | | | | | | | | | |

Background debris qualitatively estimates the amount of particles that are not pollen or spores and directly affects the accuracy of the spore counts. The categories of Light, Moderate, Heavy and Too Heavy for Accurate Count, are used to indicate the amount of deposited debris. Increasing amounts of debris will obscure small spores and can prevent spores from impacting onto the slide. The actual number of spores present in the sample is likely higher than reported if the debris estimate is 'Heavy' or 'Too Heavy for Accurate Count'. All calculations are rounded to two significant figures and therefore, the total percentage of spore numbers may not equal 100%.

* Minimum Detection Limit. Based on the volume of air sampled, this is the lowest number of spores that can be detected and is an estimate of the lowest concentration of spores that can be read in the sample. NA = Not Applicable.

Spores that were observed from the samples submitted are listed on this report. If a spore is not listed on this report it was not observed in the samples submitted.

Interpretation Guidelines: A determination is added to the report to help users interpret the mold analysis results. A mold report is only one aspect of an indoor air quality investigation. The most important aspect of mold growth in a living space is the availability of water. Without a source of water, mold generally will not become a problem in buildings. These determinations are in no way meant to imply any health outcomes or financial decisions based solely on this report. For questions relating to medical conditions you should consult an occupational or environmental health physician or professional. CONTROL is a baseline sample showing what the spore count and diversity is at the time of sampling. The control sample is usually collected outside of the structure being tested and used to determine if this sample(s) is similar in diversity and abundance to the inside sample(s)
ELEVATED means that the amount and/or diversity of spores, as compared to the control sample(s), and other samples in our database, are higher than expected. This can indicate that fungi have grown because of a water leak or water intrusion. Fungi that are considered to be indicators of water damage include, but are not limited to: Chaetomium, Fusarium, Memnoniella, Stachybotrys, Scopulariopsis, Ulocladium.
NOT ELEVATED means that the amount and/or diversity of spores, as compared to the control sample and other samples in our database, are lower than expected and may indicate no problematic fungal growth.
UNUSUAL means that the presence of current or former growth was observed in the analyzed sample. An abundance of spores are present, and/or growth structures including hyphae and/or fruiting bodies are present and associated with one or more of the types of mold/fungi identified in the analyzed sample.
NORMAL means that no presence of current or former growth was observed in the analyzed sample. If spores are recorded they are normally what is in the air and have settled on the surface(s) tested.



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL 33326    (954) 384-4446

Chain of Custody #  988338

Inside House

Outside House

Unidentified Spores — 120

Pithomyces — 40

Penicillium/Aspergillus — 160

Other Basidiospores — 1200 / 280

Other Ascospores — 400 / 160

Cladosporium — 1800 / 200

1        10        100        1000        10000

## Spores per cubic meter

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

| Habitat | Indoor Habitat | Possible Allergic Potential<br>Not an opinion or interpretation | Comments |
|---|---|---|---|
| ommon spore type the air worldwide. ead and dying plant oil. | Commonly found on wood and wallboard. Commonly grows on window sills, textiles and foods. | Type I (hay fever and asthma), Type III (hypersensitivity pneumonitis) allergies. | A very common and important allergen source both outdoors and indoors. |
| verywhere. a large part of the tside. Can reach umbers in the air ng the spring and an increase in uring and after | Very few of this group grow inside. The notable exception is Chaetomium, Ascotricha and Peziza. | Little known for most of this group of fungi. Dependent on the type (see Chaetomium and Ascotricha). | |
| found everywhere, n the late summer ese spores are from ... | Mushrooms are not normally found growing indoors, but can grow on wet lumber, especially in crawlspaces. Sometimes mushrooms can be seen growing in flower pots indoors. | Some allergenicity reported. Type I (hay fever, asthma) and Type III (hypersensitivity pneumonitis). | Among the group of Mushrooms (Basidiomycetes) are dry rot fungi Serpula and Poria that are particularly destructive to buildings. |
| verywhere. Normally e air in small amounts air. Grows on nearly | Wetted wallboard, wood, food, leather, etc. Able to grow on many substrates indoors. | Type I (hay fever and asthma) allergies and Type III (hypersensitivity pneumonitis) allergies. | This is a combination group of Penicillium and Aspergillus and is used when only the spores are seen. The spores are so similar that they cannot be reliably separated into their respective genera. |
| seen everywhere ad leaves, soil and | Not normally found growing indoors, sometimes on wallboard. | None known. | |
| verywhere. Grow on ant litter and other ed material. | Wetted cellulosic material. | None known. | This group of spores is reserved for spores whose identity is unknown. These kinds of spores have usually never been seen before in spore traps by our laboratory and/or are of such morphology that they cannot be identified with any degree of certainty to a particular genus. |

Page 4 of 9



1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

**Prepared for :** TEDDY BEAR RESTORATION

**Test Address :** EARL DELACK

104 ORVILLE WRIGHT DR

BILOXI, MS 39531

## Indoor Air Quality Testing

### Introduction
The fungi are a large group of organisms that include mold. In nature, the fungi and mold help breakdown and recycle nutrients in the environment. Mold are the most common type of fungi that grow indoors. Mold are microscopic organisms that live on plants, in the soil, and on animals, in fact almost anywhere food and moisture are available. Mold is everywhere present in the outdoor and normal indoor environments. It is in the air and on surfaces as settled dust. Exposure to mold is inevitable in everyday life. Thus, exposure to mold is considered part of a normal activity for most people. Only environments for which extraordinary preparations have been taken don't have mold present in the air or on surfaces.

### Understanding Mold
Under the right conditions (moisture, a food source, and time) mold will grow, multiply and produce spores. Mold grows throughout nature as well as the built environment. Mold reproduces by microscopic cells called "spores" that can be spread easily through the air. Mold spores are always present in the indoor and outdoor air. There are mold that can grow on any organic substrate including wood, paper, carpet, food, ceiling tiles, dried fish, carpet, or any surface where dust has accumulated. When excessive moisture or water accumulates indoors, mold growth will often occur, particularly if the moisture problem remains undiscovered or un-addressed. There is no practical way to eliminate all mold spores in the indoor environment. The way to control indoor mold growth is to control the amount of moisture available to the mold.

Mold growth can become a problem in your home or office where there is sufficient moisture and the right foodstuff is available. The key to preventing mold growth is to prevent all moisture problems. Of course, hidden mold can grow when there is water available behind walls, sinks, floors, etc. Indications of hidden moisture problems are discoloration of ceiling or walls, warped floors or condensation on the windows or walls.

### Controlling Moisture
The most critical step in solving a mold problem is to accurately identify and fix the source(s) of moisture that allowed the growth to occur. In order to prevent mold from growing, it is important that water damaged areas be dried within a 24-48 hour period. If a small amount of mold is present in the home, the mold can be cleaned up with a mild detergent and the excess water or moisture removed. It is not necessary to try and kill the mold or its spores. You can carefully remove the moldy materials if necessary.  There are many common sources of excess moisture that can contribute to indoor mold growth. Some of the primary means of moisture entry into homes and buildings are water leakage (such as roof or plumbing leaks), vapor migration, capillary movement, air infiltration, humidifier use, and inadequate venting of kitchen and bath humidity. The key to controlling moisture is to generally reduce indoor humidity within 35% - 60% (depending what climate you live in) and fix all leaks whatever their cause.

### Mold Growth Sources
If the source of moisture is not easily detected or you have a hidden water leak, mold testing can be helpful. Often a roof leak or a plumbing leak can be identified as the source. The difficulty arises when there is an odor present or when an occupant shows signs of mold exposure but no visible mold can be seen. Excess water intrusion can also lead to dry rot of lumber and cause a serious structural defect in buildings.

### Health Related Risks
Based on the Institute of Medicine and the National Academy of Sciences, dampness and mold in homes is associated with increases in several adverse health effects including cough, upper respiratory symptoms, wheeze, and exacerbation of asthma. Mold and fungi contain many known allergens and toxins that can adversely affect your health. Scientific evidence suggests that the disease of asthma may be more prevalent in damp affected buildings. Dampness and mold in homes, office buildings and schools represent a public health problem. The Institute of Medicine concluded, "When microbial contamination is found, it should be eliminated by means that not only limit the possibility of recurrence but also limit exposure of occupants and persons conducting the remediation".



1675 North Commerce Parkway, Weston, FL 33326   (954) 384-4446

## Mold Sampling Methods

The goal of sampling is to learn about the levels of mold growth and amplification in buildings. There are no EPA or OSHA standards for levels of fungi and mold in indoor environments. There are also no standard collection methods. However, several generally accepted collection methods are available to inspectors to study mold (and bacteria) in indoor environments. Comparison with reference samples can be a useful approach. Reference samples are usually taken outdoors and sometimes samples can be taken from "non-complaint" areas. In general, indoor fungal concentrations should be similar to or lower than outdoor levels. High levels of mold only found inside buildings often suggest indoor amplification of the fungi. Furthermore, the detection of water-indicating fungi, even at low levels, may require further evaluation. There are several types of testing methods that can detect the presence of mold. They can be used to find mold spores that are suspended in air, in settled dust, or mold growing on surfaces of building materials and furnishings. There are different methods that can identify types of live mold and dead mold in a sampled environment. Mold spores can be allergenic and toxic even when dead.

All sampled material obtained in the laboratory is analyzed using modern microscopic methods, standard and innovative mycological techniques, analyzed at 630 – 1,000 times magnification.

Testing for mold with an accredited laboratory is the best way to determine if you have mold and what type of mold it is.

## Surface Sampling Methods

Surface sampling can be useful for differentiating between mold growth and stains of various kinds. This type of sampling is used to identify the type of mold growth that may be present and help investigate water intrusion. Surface sampling can help the interpretation of building inspections when used correctly. The following are the different types of surface samples that are commonly used to perform a direct examination of a specific location. Spore counts per area are not normally useful.

### Tape (or tape-lift)

These samples are collected using clear adhesive tape or adhesive slide for microscopic examination of suspect stains, settled dust and spores. Tape lifts are an excellent, non-destructive method of sampling. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.

### Bulk

This is a destructive test of materials (e.g., settled dust, sections of wallboard, pieces of duct lining, carpet segments, return-air filters, etc.) to determine if they contain or show mold growth. Bulk sampling collects a portion of material small enough to be transported conveniently and handled easily in the laboratory while still representing the material being sampled. A representative sample is taken from the bulk sample and can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.

### Swab

A sterile cotton or synthetic fiber-tipped swab is used to test an area of suspected mold growth. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. The laboratory is usually able to determine if there is current of former mold growth or if only normally settled spores were sampled. Identified spores are generally reported as "present/absent".

### Carpet (filter-type) Cassette

A carpet cassette is used with a portable air pump (flow rate usually doesn't matter) to collect mold, pollen and other particulates. Samples obtained using this method can be cultured for species identification or analyzed using direct microscopy for genus identification. This method is usually used to determine a presence or absence of water-indicating mold in a carpet. The laboratory is usually able to determine if the there is current of former mold growth or if only normally settled spores were sampled.



**PRO-LAB**

1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

## Air Sampling Methods

Air samples are possibly the most common type of environmental sample that investigators collect to study bioaerosols (mold, pollen, particulates). The physics of removing particles from the air and the general principles of good sample collection apply to all airborne materials, whether biological or other origin. Therefore, many of the basic principles investigators use to identify and quantify other airborne particulate matter can be adapted to bioaerosol sampling. Common to all aerosol samplers is consideration of collection efficiency. The following are the two most common forms of air sampling methods.

**"Non-Viable Methods"**  *(The Laboratory results are reported in "spores per cubic meter (sp/m3)*

### Z5 Cassette
The $Z^5$ spore trap is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to rapidly collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small slit at the top of the cassette and spores are trapped on a sticky surface on a small glass slide inside the cassette. They are efficient at collecting spores as small as 1μm.

### Micro5 Cassette
The Micro5 Microcell spore trap cassette is used with a portable air pump (5 liters/minute for 1 to 5 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small circular hole at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. They are efficient at collecting spores as small as 0.8μm.

### Air-O-Cell Cassette
The Air-O-Cell spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 2.6μm.

### Allergenco-D Cassette
The Allergenco-D spore trap cassette is used with a portable air pump (15 liters/minute for 1 to 10 minutes) to collect airborne aerosols including mold, pollen and other airborne particulates. Air is drawn through a small opening at the top of the cassette and spores are trapped on a sticky coated glass slide inside the cassette. These cassettes are efficient at collecting spores as small as 1.7μm.

**"Viable Methods"**  *(The Laboratory results are reported in "colony forming units per cubic meter (CFU/m3)*

### Agar Impaction Plates
The agar impaction plates are used with a portable air pump (28.3 liters/minute for 1 to 3 minutes) to collect airborne mold. This is called "viable sampling" because it only grows what is alive at the time of testing. Air is drawn through a 200-400 holes at the top of the impactor and spores are trapped in the agar media. The agar plate should be shipped to the laboratory immediately or kept cool until it can be shipped. These cassettes are 90% efficient at collecting spores as small as 0.7μm. The laboratory results are reported in "colony forming units per cubic meter ($CFU/m^3$)".



1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

## Data Interpretation

Information (data) on mold in buildings can consist of the simple observation of fungal growth on a wall, analytical measurements from hundreds of environmental samples, or the results of a survey of building occupants with and without particular building-related conditions. Data interpretation is the process whereby investigators make decisions on (a) the relevance to human exposure of environmental observations and measurements, (b) the strength of associations between exposure and health status, and (c) the probability of current or future risks. These interpretation steps are followed by decisions on what measures can be taken to interrupt exposure and prevent future problems.

### Remediation of Mold

Prevention of mold growth indoors is only possible if the factors that allow it to grow are identified and controlled. When prevention has failed and visible growth has occurred in a home or building, remediation and/or restoration may be required. The extent of the mold growth will determine the scope of the remediation required. The goal of remediation is to remove or clean mold-damaged material using work practices that protect occupants by controlling the dispersion of mold from the work area and protect the workers from exposure to mold. You should consult a professional when contemplating fixing a large area of mold growth. Generally, remediation requires (a) removal of porous materials showing extensive microbial growth, (b) physical removal of surface microbial growth on non-porous materials to typical background levels, and (c) reduction of moisture to levels that do not support microbial growth. Identification of the conditions that contributed to microbial proliferation in a home or building is the most important step in remediation. No effective control strategy can be implemented without a clear understanding of the events or building dynamics responsible for microbial growth. Following the completion of the remediation process, mold testing should be performed to obtain clearance.

### Symptoms of Mold Exposure

The most common symptoms of mold exposure are runny nose, eye irritation, cough, congestion, and aggravation of asthma. Individuals with persistent health problems that appear to be related to mold or other types of air quality contaminant exposure should see their physicians for a referral to specialists who are trained in occupational/environmental medicine or related specialties and are knowledgeable about these types of exposures. Decisions about removing individuals from an affected area must be based on the results of such medical evaluation. Mold is naturally present in outdoor environments and we share the same air between the indoor and outdoor, it is impossible to eliminate all mold spores indoors.

### Ten Things You Should Know About Mold

1) Potential health effects and symptoms associated with mold exposures include allergic reactions, asthma, and other respiratory problems.

2) There is no practical way to completely eliminate mold and mold spores in the indoor environment. The way to control indoor mold growth is to control moisture.

3) If mold is a problem in your home or building, you must clean up the mold and eliminate sources of moisture.

4) To prevent mold growth any source of a water problem or leak must be repaired.

5) Indoor humidity must be reduced (generally below 60%) to reduce the chances of mold growth by: adequately venting bathrooms, dryers, and other moisture-generating sources to the outside; using air conditioners and de-humidifiers; increasing ventilation; and using exhaust fans whenever cooking, dishwashing and cleaning.

6) Clean and dry any damp or wet building materials and furnishings within 24-48 hours to prevent mold growth.

7) Clean mold off of hard surfaces with water and detergent and dry completely.

8) Prevent condensation: reduce the potential for condensation on cold surfaces (e.g., windows, piping, exterior walls, roof, or floors) by adding insulation.

9) In areas where there is a perpetual moisture problem on the floor, do not install carpeting

10) Mold can be found almost anywhere. Mold can grow on wood, paper, carpet, foods; almost anything can support some mold growth provided there is moisture, time to grow and food to eat.



1675 North Commerce Parkway, Weston, FL  33326    (954) 384-4446

## References & Resources

Bioaerosols: Assessment and Control, Janet Macher, Sc.D., M.P.H., Editor. 1999. ACGIH, 1330 Kemper Meadow Drive, Cincinnati, OH 45240-1634.

Health Implications of Fungi in Indoor Environments, Edited by R.A. Samson. 1994. Elsevier Science, P.O. Box 945, Madison Square Station, New York, NY 10159-0945.

Damp Indoor Spaces and Health, Institute of Medicine of the National Academies, Washington, DC, 2004

Field Guide for the Determination of Biological Contaminants in Environmental Samples, 2nd Edition, Edited by L-L. Hung, et al. AIHA, Fairfax, VA, 2005.

Recognition, Evaluation, and Control of Indoor Mold, Edited by B. Prezant, et al. AIHA, Fairfax, VA, 2008.

## Useful Websites

www.acgih.org/resources/links.htm
American Conference of Governmental Industrial Hygienists - information on Indoor Air Quality and useful links

www.cal-iaq.org
California Indoor Air Quality Program - California Indoor Air Quality resources and useful links

www.health.state.ny.us/environmental/indoors/air/mold.htm
New York State Department of Health - New York state recommendations for IAQ, indoor mold inspections, remediation, and prevention

http://www.nyc.gov/html/doh/html/epi/moldrpt1.shtml
Guidelines for Assessment and Remediation of Fungi in Indoor Environments – a good reference for mold clean up and removal

orf.od.nih.gov/PoliciesAndGuidelines/ORFPolicies/MoldPrevPolicy.htm
National Institutes of Health - information mold prevention and remediation

http://www.niehs.nih.gov/health/topics/agents/mold/index.cfm
National Institute of Environmental Health Sciences - information on mold

www.epa.gov/mold/
United States Environmental Protection Agency website on mold and moisture

www.aaaai.org/nab/index.cfm?p=faq
American Academy of Allergy, Asthma, and Immunology – information on mold and allergies and outdoor allergens

http://www.aanma.org/?s=mold
Allergy & Asthma Network – information for homes about allergies and asthma

http://www.homeenergyresourcemn.org
Minnesota Department of Commerce Energy Information Center – good information on moisture control in homes

http://eetd.lbl.gov/ie/
Governmental Indoor Environment Department – good information on indoor health, comfort and energy efficiency in buildings

http://www.osha.gov/dts/shib/shib101003.html
Occupational US Department of Labor (OSHA) - A Brief Guide to Mold in the Workplace



## 52-Point Visual Inspection

Prepared for

Site Address

City                                            State            Zip

Inspector

Date                                            Time

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - We always suggest to have a Direct ID Sample for visible microbial growth.
   - If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

**Important:** If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

Client Present          Age of Home          Weather          Exterior Temp

EXHIBIT
B



## 52-Point Visual Inspection

# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☒ |
| 3 | Are gutters present? | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☐ | No ☒ |

Comments: (Note anything visible)

# ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

# Foundation Type

| 10 | Basement ☐ | Crawl ☒ | Slab ☐ |
|---|---|---|---|

# Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☒ | No ☐ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:



# 52-Point Visual Inspection

## Crawl Space (Enter only if safe to do so)

| | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☐ | No ☒ |
| 15 | Is there microbial growth? *Crawl Space Insulation* | Yes ☒ | No ☐ |
| 16 | Is there a vapor barrier? | Yes ☒ | No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☒ | No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☒ | No ☐ |
| 19 | Is there room for you to crawl? | Yes ☒ | No ☐ |
| 20 | Is there any rot? | Yes ☐ | No ☒ |
| 21 | Is the insulation intact? | Yes ☒ | No ☐ |
| 22 | Is the insulation wet? | Yes ☐ | No ☒ |
| 23 | Is the duct work intact? | Yes ☒ | No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☒ |
| 25 | Are the floor joists intact? | Yes ☒ | No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 27 | Are any vents blocked off? | Yes ☒ | No ☐ |

Comments:



## 52-Point Visual Inspection

# INSIDE

## Microbial Activity

| | | Yes | No |
|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | ☐ | ☒ |
| 31 | Is there a musty odor present? | ☐ | ☒ |
| 32 | Are there any water marks? | Yes | No (circled) |

Comments:

## Attic

| 33 | Anything suspicious? (including lack of proper ventilation) | Yes ☐ | No ☒ |
|---|---|---|---|

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.

Comments:

## Kitchen and Laundry

| 34 | Is the dryer ventilation intact? | Yes ☒ | No ☐ |
|---|---|---|---|
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☒ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☒ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☒ |

Comments:



## 52-Point Visual Inspection

### Bedroom/Office(s)

**Indicate Name of Bedroom/offices

| | | R01 | | R02 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒ | No ☐ | Yes ☒ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |

**Indicate Name of Bedroom/offices

| | | R03 | | R04 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒ | No ☐ | Yes ☒ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |

**Indicate Name of Bedroom/offices

| | | R05 | | R06 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R07 | | R08 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R09 | | R10 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R11 | | R12 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

Comments:



# 52-Point Visual Inspection

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

| | | Bathroom 1 | Bathroom 2 |
|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒  No ☐ | Yes ☒  No ☐ |
| 43 | Any leaks under the sink? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒  No ☐ | Yes ☐  No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 46 | Any leaks around hot the water heater? | Yes ☐  No ☒ | Yes ☐  No ☒ |

Comments:

## HVAC

| 47 | Is there a return vent? | Yes ☒  No ☐ |
|---|---|---|
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐  No ☒ |

Comments: (Note condition of return and ducts)

## Relative Humidity Indoors

49. Readings /Comments:

65% RH

## Moisture Indoors

50. Readings /Comments:

11% - 14.1%

throughout the Inside of Home

**52-Point Visual Inspection**

Do You Recommend Remediation?   Yes ☐   No ☐   Possibly ☒

49. Explanation:

## Issues of Concern

50. Comments:

51. Recommended Preventative Measures:

## Inspector Recommends These Areas to Test

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.*

Tape Lift of Microbial growth on insulation in crawl space

Tape Lift of Microbial growth outside between siding and wall boards



## 52-Point Visual Inspection

### THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days. *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   **\*If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with_____at MTUSA.

**Please have Customer Initial the following:**

I agree to pay $_____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.                                             Initial:

## Signatures

Inspector Signature:                                             Date:

                                                                10·28·2016

Customer Signature:                                             Date:

Law Firm

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?        Yes        No

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

Inspector Signature:                                             Date:

                                                                10·28·2016

Customer Signature:                                             Date:

Law Firm

# Mold Test USA Customer Agreement

Property Address: _104 Orville Wright Dr, Biloxi MS 39531_

The inspector recommends, and you agree, that the following areas be sampled:

| Location of sample | Type of Sample (circle) | # of samples in area | PRICING Base Rate: $ 550 (includes 2 samples) Additional samples: $85 ea. |
|---|---|---|---|
| 1. Outside Back | Air/Swab/Tape/bulk material | 1 | |
| 2. Inside Upstairs | Air/Swab/Tape/bulk material | 1 | |
| 3. Behind the siding | Air/Swab/Tape/bulk material | 1 | additional |
| 4. Crawlspace | Air/Swab/Tape/bulk material | 1 | additional |
| 5. | Air/Swab/Tape/bulk material | | |
| 6. | Air/Swab/Tape/bulk material | | |
| 7. | Air/Swab/Tape/bulk material | | |
| 8. | Air/Swab/Tape/bulk material | | |
| 9. | Air/Swab/Tape/bulk material | | |
| 10. | Air/Swab/Tape/bulk material | | |

The inspector suggested the following areas below to be tested in which you chose not to have tested.

**Customer Initials** _ll_

EXPEDITED? YES/ NO (circle)   Waived Fee          Expedited Amount: $ 50.00

### *Total Price for services rendered:*   $ 770.00

Payment Method: _Law Firm_   **Transaction ID:** _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A   GUARANTEE OF ANY KIND; NOR DOES IT SUBSTUTUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby   agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in  anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results with you and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA.  By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.   **Customer Initials** _ll_

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the   applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect   to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby   consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations _of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

| | | | |
|---|---|---|---|
| _(signature)_ | _28 Oct 2016_ | _(signature)_ | _10-28-2016_ |
| **Customer's Signature** | **Date** | **Inspector's Signature** | **Date** |

877-554-6653 admin@moldtestusa.com  Mon-Fri 9am-7pm EST





# 52-Point Visual Inspection

Prepared for

Site Address  *208 Patrick Dr.*

City  *Biloxi*          State  *MS*    Zip  *39531*

Inspector  *Jamel Smith*

Date  *10-27-2016*       Time  *5:00 pm*

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - **We always suggest to have a Direct ID Sample for visible microbial growth.**
   - **If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.**

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

**Important:** If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

| Client Present | Age of Home | Weather | Exterior Temp |
|---|---|---|---|
| *Yes* | *10* | *Clear & Sunny* | *80°* |



## 52-Point Visual Inspection

# OUTSIDE

| 1 | Is there standing water in the yard? | | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | | Yes ☐ | No ☒ |
| 3 | Are gutters present? | | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

## ROOF (Do not climb onto roof)

| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

## Foundation Type

| 10 | Basement ☐ | Crawl ☒ | Slab ☐ |

## Basement

| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☒ | No ☐ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:



# 52-Point Visual Inspection

## Crawl Space (Enter only if safe to do so)

| 14 | Are there any leaks? | Yes ☒ No ☐ |
| 15 | Is there microbial growth? *Around HVAC vents* | Yes ☒ No ☐ |
| 16 | Is there a vapor barrier? | Yes ☒ No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☒ No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☒ No ☐ |
| 19 | Is there room for you to crawl? | Yes ☒ No ☐ |
| 20 | Is there any rot? | Yes ☐ No ☒ |
| 21 | Is the insulation intact? | Yes ☒ No ☐ |
| 22 | Is the insulation wet? | Yes ☐ No ☒ |
| 23 | Is the duct work intact? | Yes ☒ No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ No ☒ |
| 25 | Are the floor joists intact? | Yes ☒ No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ No ☒ |
| 27 | Are any vents blocked off? | Yes ☐ No ☒ |

Comments:



## 52-Point Visual Inspection

# INSIDE

## Microbial Activity

|  |  |  |  |
|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | Yes ☐ | No ☒ |
| 31 | Is there a musty odor present? | Yes ☐ | No ☒ |
| 32 | Are there any water marks? | Yes ☒ | No |

Comments:

## Attic

|  |  |  |  |
|---|---|---|---|
| 33 | Anything suspicious? (including lack of proper ventilation) | Yes ☐ | No ☒ |

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.

Comments:

## Kitchen and Laundry

|  |  |  |  |
|---|---|---|---|
| 34 | Is the dryer ventilation intact? | Yes ☒ | No ☐ |
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☒ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☒ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☒ |

Comments:



# 52-Point Visual Inspection

## Bedroom/Office(s)

**Indicate Name of Bedroom/offices

| | | R01 | | R02 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☒ | No ☐ | Yes ☒ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |

**Indicate Name of Bedroom/offices

| | | R03 | | R04 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |

**Indicate Name of Bedroom/offices

| | | R05 | | R06 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R07 | | R08 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R09 | | R10 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

**Indicate Name of Bedroom/offices

| | | R11 | | R12 | |
|---|---|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |

Comments:



## 52-Point Visual Inspection

### Bathroom(s)

**\*\*If more than 2 bathrooms, please describe in comment section**

|  |  | Bathroom 1 | Bathroom 2 |
|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒ No ☐ | Yes ☒ No ☒ |
| 43 | Any leaks under the sink? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 46 | Any leaks around hot the water heater? | Yes ☐ No ☒ | Yes ☐ No ☒ |

Comments:

_There appeared to be a leak of some sort at the bottom of shower door._
_Insulation of top of hot water heater had microbial growth_

### HVAC

| 47 | Is there a return vent? | Yes ☒ No ☐ |
|---|---|---|
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐ No ☒ |

Comments: (Note condition of return and ducts)

### Relative Humidity Indoors

49. Readings /Comments:

_69 % Humidity_

### Moisture Indoors

50. Readings /Comments:

_9 % — 15 %_

**MoldTest USA**

## 52-Point Visual Inspection

Do You Recommend Remediation?   Yes ☐   No ☐   Possibly ☒

49. Explanation:

If test results come back positive for toxic mold home owners need to remediate and not be exposed to it

## Issues of Concern

50. Comments:

51. Recommended Preventative Measures:

## Inspector Recommends These Areas to Test

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.*

Tape lift of HVAC because of visual microbial growth



## 52-Point Visual Inspection

### THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days. *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   **\*If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with_____at MTUSA.

**Please have Customer Initial the following:**

I agree to pay $_____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.

Initial:

## Signatures

Inspector Signature:

Date: 10·28·2016

Customer Signature:

Date: 7016/0/29

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?     Yes     No

**I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.**

Inspector Signature:

Date: 10-28-2016

Customer Signature:

Date: 2016/0/7

# Mold Test USA Customer Agreement

Property Address: _208 Patrick Drive Biloxi MS_

The inspector recommends, and you agree, that the following areas be sampled:

| Location of sample | Type of Sample (circle) | # of samples in area | PRICING Base Rate: $ 350.00 (includes 2 samples) Additional samples: $85 ea. |
|---|---|---|---|
| 1. Outside Front | (Air)/Swab/Tape/bulk material | 1 | |
| 2. Inside living | (Air)/Swab/Tape/bulk material | 1 | |
| 3. Front Hallway HVAC | (Air)/Swab/Tape/bulk material | 1 | $85 00 |
| 4. | Air/Swab/Tape/bulk material | | |
| 5. | Air/Swab/Tape/bulk material | | |
| 6. | Air/Swab/Tape/bulk material | | |
| 7. | Air/Swab/Tape/bulk material | | |
| 8. | Air/Swab/Tape/bulk material | | |
| 9. | Air/Swab/Tape/bulk material | | |
| 10. | Air/Swab/Tape/bulk material | | |

**The inspector suggested the following areas below to be tested in which you chose not to have tested.**

Customer Initials _JW_

EXPEDITED? YES / NO (circle)   Waived Fee _____   Expedited Amount: $ _50.00_

### Total Price for services rendered:   $ _685.00_

Payment Method: _Law Firm_   Transaction ID: _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A  GUARANTEE OF ANY KIND; NOR DOES IT SUBSTUTUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby    agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in  anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA.  By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.                          Customer Initials _____

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the    applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect   to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby    consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations   of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

_____   _10/28/16_   _____   _10-28-2016_
Customer's Signature        Date          Inspector's Signature        Date

877-554-6653 admin@moldtestusa.com  Mon-Fri 9am-7pm EST









Laboratory

# NML-20161031-Rushing and Guice PLLC - 104 Orville Wright Dr

## Spore Analysis Completed for

1101 1st Street South Suite B, Columbia, SC 29209
803-776-0562
admin@moldtestusa.com

| | |
|---|---|
| Collected Date | 10/28/2016 |
| Collected Street Address | 104 Orville Wright Dr |
| Collected & Relinquished by | Junal Smith |
| # of Sample Sent | 4 |
| Received Date | 10/31/2016 |
| # of Sample Received & Accepted | 4 |
| Analyzed Date | 10/31/2016 |
| Accepted & Analyzed by | Janna Komorowski |
| Approved by | Crystal Hernandez |

## Spore Analysis Completed by

*Janna Komorowski*

Laboratory Director, B.A. in Biological Sciences

*Crystal Hernandez*

Operations Director, B.A. in Biology

1101 1st Street South EXT Suite C, Columbia SC 29209

Laboratory

©2013-2016 Newton Microbial Laboratory

EXHIBIT
C

Newton
Laboratory

Newton ML ID #

20161031 Rushing and Guice PLLC - 104 Orville Wright Dr

**Property/Customer Name:** Rushing and Guice PLLC - 104 Orville Wright Dr
**Company Email:**
**Company Address:** 1101 1st Street South EXT, Suite B, Columbia, SC 29205

**Site Street Address:** 104 Orville Wright Dr
**Company Phone Number:** 803-776-0562
**Company Name:** Mold TEST USA

**Site City:** Biloxi
**Site State:** MS
**Site Zip:** 39531
**Date Collected:** 10/28/2016
**Sample Collected by:** Jumal Smith
**Date Received:** 10/31/2016
**Date Reported:** 10/31/2016

| | SPC-0001 | | | SPC 0002 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Newton MLI ID Number | | | | | | | | | |
| Sample ID Number | SPC-0001 | | | SPC 0002 | | | | | |
| Sample Name/Location | Control/Outside | | | Upstairs Hallway | | | | | |
| Volume (L) | 150 | | | 150 | | | 150 | | |
| Background* | 4 | | | 4 | | | | | |
| Limit of Detection (Spore/M³) | 7 | | | 7 | | | | | |

| Sample Type | Spore Count | | | Spore Count | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Organism** | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total |
| Alternaria | 3 | 20 | 4.76% | 2 | 13 | 6.06% | | | |
| Ascospores | Not Detected | | | 1 | 7 | 3.03% | | | |
| Aspergillus|Penicillium | Not Detected | | | Not Detected | | | | | |
| Basidiospores | Not Detected | | | Not Detected | | | | | |
| Bipolaris|Drechslera | 3 | 20 | 4.76% | Not Detected | | | | | |
| Chaetomium | Not Detected | | | Not Detected | | | | | |
| Cladosporium | 53 | 353 | 84.13% | 26 | 173 | 78.79% | | | |
| Curvularia | 1 | 7 | 1.59% | 1 | 7 | 3.03% | | | |
| Epicoccum | Not Detected | | | Not Detected | | | | | |
| Fusarium | Not Detected | | | Not Detected | | | | | |
| Memnoniella | Not Detected | | | Not Detected | | | | | |
| Myxomycetes|Smuts | 2 | 13 | 3.17% | 2 | 13 | 6.06% | | | |
| Pithomyces | 1 | 7 | 1.59% | Not Detected | | | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | | | |
| Stemphylium | Not Detected | | | Not Detected | | | | | |
| Torula | Not Detected | | | Not Detected | | | | | |
| Trichoderma | Not Detected | | | Not Detected | | | | | |
| Ulocladium | Not Detected | | | Not Detected | | | | | |
| Unspecified Spore | Not Detected | | | 1 | 7 | 3.03% | | | |
| **Total** | 63 | 420 | 100.00% | 33 | 220 | 100.00% | | | |

| Hyphal Fragment | 7 | 13 | |
| --- | --- | --- | --- |
| Spore Ct + Dander | na | na | |
| Fiber | na | na | |
| Pollen | na | na | |
| Comments | | | |

Color Code    Common Outdoor    Common Indoor    Water Damage Indicator    Elevated Counts

©2013-2016 Newton Microbial Laboratory

Newton Laboratory

2016-031 Rushing and Guice PLLC - 104 Divide Wright Dr

Newton, MS, USA

Control/Outside    Upstairs Hallway

0    50    100    150    200    250    300    350    400

Alternaria
Ascospores
Aspergillus|Penicillium
Basidiospores
Bipolaris|Drechslera
Chaetomium
Cladosporium
Curvularia
Epicoccum
Fusarium
Memnoniella
Myxomycetes|Smuts
Pithomyces
Stachybotrys
Stemphylium
Torula
Trichoderma
Ulocladium
Unspecified Spore

©2013-2016 Newton Microbal Laboratory

Newton
Laboratory

## Spore Trap Count Explanation



| | |
|---|---|
| Volume | Flow Rate * Flow Rate Minute |
| Background | None: Recollect |
| | 1: <5% |
| | 2: 5% ≤ Background Coverage < 25% |
| | 3: 25% ≤ Background Coverage < 70% |
| | 4: 70% ≤ Background Coverage < 90% |
| | 5: 90% ≤ Background Coverage < 100%, Recollect |
| Cts/M³ | Spore Counts per Cubic Meter |
| Hyphal Fragment | Fragments of hyphae. Can be an additional indicator of possible mold presences |
| Unspecified Spore | Less commonly identified spore type |
| Limit of Detection | 1 spore count per coverage examined area |
| Sample Type | |
| Spore Count | Spore Trap Cassettes  Identification & Enumeration of Fungal Spores |
| Spore Count+ | Spore Trap Cassettes  Identification & Enumeration of Fungal Spores |
| | + Total Dander, Fiber, and Pollen Count |

*Uncertainty available upon request

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

Newton MLID #
2016/033 Rushing and Guice PLLC - 104 Orville Wright Dr

| Site Name | | | | | Site Address | | | | | Site City | | | | | Site State | | | | Site Zip | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rushing and Guice PLLC - 104 Orville Wright Dr | | | | | 104 Orville Wright Dr | | | | | Biloxi | | | | | MS | | | | 39531 | | |

Company Email: admin@moldtestusa.com
Company Phone Number: 803-776-0562
Date Collected: 10/28/2016
Date Received: 10/31/2016

Company Address: 1101 1st Street South EXT. Suite B, Columbia, SC 29209
Company Name: Mold TEST USA
Sample Collected by: Jamal Smith
Date Reported: 10/31/2016

Newton MLID Number: NML-2016/033-Rushing and Guice PLLC - 104 Orville Wright Dr | NML-2016/033-Rushing and Guice PLLC - 104 Orville Wright Dr
Sample ID Number: DIR 0001 | DIR 0002
Sample Name: Siding and Insulation | Upstairs Crawlspace
Sample Type: Direct ID - Tape | Direct ID - Tape

| Organism | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | ND | | | | | | | | | | | |
| Ascospores | ND | | | | ND | | | | | | | | | | | |
| Aspergillus\|Penicillium | ND | | | | ND | | | | | | | | | | | |
| Basidiospores | ND | | | | ND | | | | | | | | | | | |
| Bipolaris\|Drechslera | ND | | | | ND | | | | | | | | | | | |
| Chaetomium | ND | | | | ND | | | | | | | | | | | |
| Cladosporium | ND | | | | ND | | | | | | | | | | | |
| Curvularia | ND | | | | ND | | | | | | | | | | | |
| Epicoccum | ND | | | | ND | | | | | | | | | | | |
| Fusarium | ND | | | | ND | | | | | | | | | | | |
| Memnoniella | ND | | | | ND | | | | | | | | | | | |
| Mycomycetes\|Smuts | ND | | | | ND | | | | | | | | | | | |
| Pithomyces | ND | | | | ND | | | | | | | | | | | |
| Stachybotrys | ND | | | | ND | | | | | | | | | | | |
| Stemphylium | ND | | | | ND | | | | | | | | | | | |
| Torula | ND | | | | ND | | | | | | | | | | | |
| Trichoderma | ND | | | | ND | | | | | | | | | | | |
| Ulocladium | ND | | | | ND | | | | | | | | | | | |
| Unspecified Spore | ND | | | | ND | | | | | | | | | | | |

ND = Not Detected

| | Trace | Light | Med | High | Trace | Light | Med | High | Trace | Light | Med | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hyphal Fragment | | Heavy | | | | Heavy | | | | | | |
| Background Debris | | Heavy | | | | Heavy | | | | | | |

Comments

Color Code — Common Outdoor — Common Indoor — Water Damage Indicator — Color Code

Newton
Laboratory



# Direct Identification Explanation

**Direct ID**

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

**Unspecified Spore**   Less commonly identified spore type

**Sample Type**

| | |
|---|---|
| Direct ID-Swab | Swab for ID only |
| Direct ID-Swab+ | Swab for ID + Spore Count |
| Direct ID-Tape | Swab for ID only |
| Direct ID-Tape+ | Swab for ID + Spore Count |
| Direct ID-Bulk | Swab for ID only |
| Direct ID-Bulk+ | Swab for ID + Spore Count |
| Culture | Air Plate, Swab, Bulk |

| |
|---|
| ID and Quantitative Enumeration of Spores |
| ID and Enumeration with Spore Count |
| ID and Quantitative Enumeration of Spores |
| ID and Enumeration with Spore Count |
| ID and Quantitative Enumeration of Spores |
| ID and Enumeration with Spore Count |
| Identification and Enumeration of Mold only |

©2013-2016 Newton Microbial Laboratory

Newton Intl. ID #
20161031 Rothing and Guice PHC - 104 Orville Wright Dr

Newton
Laboratory







## Alternaria

**Growth & Distribution**

- Alternaria is one of the most common and widely distributed molds on the planet (2). The reproductive spores become airborne easily and are prolific in the atmosphere worldwide.

- **Growth Rate:** Rapid Mature with 0.5 to 8 days (34)

- **Water activity:** 0.85-0.88 (1)

- **Outdoors:** In the outdoor environment, Alternaria is found in soil, water and plant material- it plays an important role in vegetable matter decomposition (1) . Airborne Alternaria spore counts are often higher around farming and agricultural operations, particularly during harvesting processes when spores are released into the air in large numbers. (3) It is well studied as a plant pathogen having saprophytic effects on a wide variety of vegetation and is often the source of early blights in crops (2). It reaches peak concentrations during late summer and fall (2).

- **Indoors:** Alternaria can be found growing indoors on textiles, dust, wood, carpeting, flooring, drywall or gypsum board, wall paper, furniture, and other cellulose materials. It can be found in humidifiers, heating and air conditioning units, inside of ductwork, and surrounding damp areas i.e. sinks, showers, and windows(1).

**Health Effects**

- **Allergenic**

  - Considered by some to be among the most common mold allergens in the US (1).
  - Alternaria can cause allergy symptoms following ingestion, inhalation, injection or direct contact.
  - Alternaria spores are airborne allergens (1). Reactions due to inhalation may increase during peak concentration times in late summer and early fall.
  - Inhalation of high concentrations by sensitive individuals may manifest in Type I and Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III).

- **Pathogen**

  - Invasion is rare but can occur, particularly in immunocompromised individuals. Cases of onychomycosis (nail infection), sinusitis, ulcerated cutaneous infections, keratitis, phaeohyphomycosis, as well as osteomyelitis and peritonitis in patients undergoing peritoneal dialysis have been reported  (1,4).
  - Can occasionally cause phaeohyphomycosis (fungal infection), usually in subcutaneous tissue (6).

- **Toxins/Metabolites**

  - Alternariol (antifungal uses), AME (alternariol monomethylether),  tenuazonic acid, & altertoxins (1)

Found in Sample(s)
AIR       *Control/Outside+Upstairs Hallway••••••••••••
DIRECT    ••••••••••••••••



(1)list of reference can be found at http://www.newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory



Ascospores

## Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

‒   Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
‒   **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.
‒   **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

## Health Effects

‒   **Allergen**
  •   Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  •   Reactions due to spore inhalation may increase following rain or high humidity. (5)
  •   Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

‒   **Pathogen**
  •   Some types can be pathogenic; dependent upon genus and species.

‒   **Toxins\Metabolites**
  •   Vary greatly depending on genus and species.

Found on Sample(s)
AIR          **Upstairs Hallway**************
DIRECT       *****************

(1)See all references.List to be found at: http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

# Newton
Laboratory

# Bipolaris/Drechslera



**Growth & Distribution:**

- Bipolaris, Drechslera, Exserohilum, & Helminthosporium are dematiaceous fungi, producing spores which are elongate, cylindrical, often with numerous septations or cells. These genera are grouped together due to spore similarity. These spores are common in both indoor and outdoor environments. They are found world wide with some species being exceptionally tolerant of dry environments (6).

- **Growth Rate:** Rapid – Mature within 5 days (6)

- **Water Activity:** 0.80 (this is a generalized number for common molds) (26)

- **Outdoors:** These molds are most commonly found on grasses, grains and other plant materials. Bipolaris can be a plant pathogen causing spots, blights, rots, and other symptoms in staple crops like rice, wheat, and sorghum. In the past, plant disease caused by Bipolaris invasion has caused starvation of large human populations. In 1943-1944 the Bengal famine in India was caused by *Bipolaris oryzae* disease in rice. In the 1970s, *Bipolaris maydis* was responsible for a devastating leaf blight resulting in huge losses of corn crops in the USA & UK. (11)

- **Indoors:** These mold may be found on water damaged materials, food stuffs, houseplants, and other organic materials.

**Health Effects:**

- **Allergenic:**
  - These molds are highly common in both indoor and outdoor environments; most people have some level of exposure on a daily basis.
  - In sensitive individuals can manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogenic:**
  - Bipolaris (rapid growth – mature within 5 days) can be pathogenic in rare instances, particularly in immunocompromised. May invade bone, cornea (keratomycosis), skin, aorta, lung, central nervous system or cause brain lesions (6).
  - Exserohilum (rapid growth – mature within 5 days) can cause phaeohyphomycosis (infection of mycelia/hyphae of dematiaceous fungi), most commonly in nasal sinuses, skin, subcutaneous tissue, and cornea. Rare reports of fatal disseminated infection (6).

- **Mycotoxins/Metabolites:**
  - Cytochalasin, sporidesmin, sterigmatocystin (7)

Found in Sample(s)
AIR        •Control/Outside••••••••••••
DIRECT   •••••••••••••••••

†List of references to be found at http://newtonlaboratory.com/glossary

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

# Cladosporium

## Growth & Distribution:

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).

- **Growth Rate:** Moderately Rapid – Mature within 7 days. (6)

- **Water Activity:** 0.85-0.88 (1)

- **Outdoors:** Cladosporium can be found on food sources such as cereals, fruit, vegetables.  Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (*C. cladosporioides*) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).

- **Indoors:** Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7).  Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

## Health Effects:

- **Allergen:**
  - Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).

- **Mycotoxins/Metabolites:**
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

(List of references can be found at: http://newtonlabmorbis.com/glossary

Found in Sample(s)
AIR    •Control/Outside-Upstairs Hallway••••••••••••••
DIRECT   ••••••••••••••



# Curvularia

## Growth & Distribution

- Curvularia is found world-wide with a particular preference for the tropics and warmer climates (7). Spores usually have a unique curved shape caused by an enlarged central cell (2). Airborne spores are common in both indoor and outdoor environments worldwide.
- **Growth Rate:** Moderately rapid - 4 to 12 days (32)
- **Water activity:** 0.80 (this is a generalized number for common molds) (26)
- **Outdoors:** Curvularia is typically seen growing on plant material. They are weakly pathogenic to plants and are the cause of leaf spots, seedling blight, and failing of seedling germination (2).
- **Indoors:** Curvularia may be found growing on materials containing cellulose such as woods and grains. Growth is less frequent indoors but may be seen on food.(7)

## Health Effects:

- **Allergen:**
    - Poorly studied but believed to be an allergen and irritant (13).
    - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis &allergic sinusitis (Type III). (5)

- **Pathogen:**
    - Believed to cause corneal infections in the immunocompromised  (14)
    - Opportunistic infections of cornea and sinuses, nails, subcutaneous tissue, and systemic organs. Dissemination to the brain can occur rarely. (6)
    - Can be causal agent in mycetoma (6):
        - Infections of subcutaneous tissue and skin. Untreated, chronic infections may progress to involve muscle, fascia & bone. Typically seen on the lower leg or foot, rarely disseminated.
        - Fungi enters the skin via wound, a nodule slowly develops into a tumor or abnormal tissue mass beneath the skin, cavities are formed within the mass and discharge occurs.
        - This is a rare condition which is not contagious. (6) Most infections occur in immunocompromised  hosts. (2)

- **Toxins/Metabolites:**
    - Some toxins produced- mainly studied in plants.

Found in (sample):
AIR          •Control/Outside•Upstairs Hallway•••••••••••••
DIRECT          •••••••••••••••••

(Lists of references can be found at http://newtonlabsonline.com/glossary)

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory



## Growth & Distribution

– Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 μm)(25).

**Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).

**Water Activity:** 0.80 (this is a generalized number for common molds)(26).

**Outdoors**

– Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)

**Indoors**

– Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

## Health Effects:

– **Allergen:**
  - These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogen:**
  - Unknown

– **Toxins/Metabolites:**
  - Unknown



Founded in
AIR
Direct

•Control/Outside•••••••••••••••••
••••••••••••••••

(Lists of references can be found at http://newtonlaboratories.com/january)

Newton Mu. 10 #
20160031 Rushing and Guice PLLC - 104 Orville Wright Dr

©2013-2016 Newton Microbial Laboratory

Newton
Laboratory

©2013-2016 Newton Microbial Laboratory



# Pithomyces

**Growth & Distribution:**

The colonies grow fairly fast, usually dark (grey to black) in color, while occasionally being yellowish white in color, suede- like to downy, with multicellular conidia (phragmo- or dictyoconidia) forming on peg- like extensions. The conidia extensions are oblong, segmented, verrucose and light brown in color. (4, 29) These spores can be distributed by light winds, rain, and by grazing sheep (27).

- **Growth Rate:** Rapid – Mature within 5 days (6)
- **Water Activity:** 0.80 – 0.89 (28)
- **Outdoors**
  - Can be found on soil and litter (4). During sheep grazing can be found on herbage due to dry litter (27)
- **Indoors**
  - Can be found on paper (30).

**Health Effects:**

- **Allergen:**
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Can very rarely cause infection in the immunocompromised (6).
  - Can cause onychomycosis (29).
  - One case of peritonitis reported in **a patient with vulvar cancer.** (29)

- **Toxins/Metabolites:**
  - Sporidesmin (a mycotoxin which causes facial eczema in sheep)(31).

Found in Sample(s):
AIR
DIRECT

*Control•Outside•Upstairs Hallway••••••••••••••••





‡ List of references can be found at http://newtonbehavior.com/glossary

©2013-2016 Newton Medical Laboratory

## Newton Laboratory

# Stachybotrys



### Growth & Distribution

– Stachybotrys is found worldwide. One species in particular, Stachybotrys chartarum (sometimes called "black mold" or "toxic mold"), has gained attention recently following concerns about indoor air quality and mold contamination.

**Growth Rate:** Moderately Rapid – Usually mature with 7 days. Growth may be slower on media that are not high in cellulose.

**Water Activity:** Minimal 0.94; Optimal >0.98 (1)

**Outdoors**

– Found on decaying plant material and in soil. May contaminate grains, tobacco, wood pulp, and other plant debris. Spore concentrations are generally low in outside air.

**Indoors**

– Typically found growing indoors on materials containing cellulose with high water content. This can include water damaged building materials such as wood, gypsum board, wall paper, textiles, carpeting, and cardboard. Stachybotrys does not generally grow without prolonged access to moisture, usually lasting days or weeks. It is also not well suited for competition against other molds. Spores do not become airborne easily and generally settle out of the air quickly. For this reason, airborne spores are often the result of recent physical disturbance of colonies. (1)

### Health Effects:

– **Allergen:**

• In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogen:**

• No reported cases of human or animal infection (1).

– **Toxins/Metabolites:**

• May be associated with pulmonary hemorrhage & hemosiderosis in infants (6).

• Has frequently been suggested as a contributing agent in a variety of illnesses reported by occupants of water damaged buildings; however, establishing a firm causal relationship requires further study (6).

• The species S. chartarum produces several mycotoxins that may affect humans and animals after ingestion, inhalation, or absorption (1).

• Griseofulvin, trichothecenes (isosatratoxin, roridin, satratoxin, trichodermol, trichoverrol (12)

Found in Sample(s)
AIR ••••••••••••
DIRECT •Siding and Insulation•Upstairs Crawlspace•••••••••••••••••••

[1 set of references can be found at http://newtonlaboratory.com/glossary]